## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JONATHAN CHICK,**<br>**on behalf of himself and all others**<br>**similarly situated,** | **Case No.:** |
| **Plaintiff,** | **CLASS ACTION** |
| **v.** | **JURY TRIAL DEMAND** |
| **GEICO GENERAL INSURANCE**<br>**COMPANY, and CCC INTELLIGENT**<br>**SOLUTIONS, INC.** | |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff Jonathan Chick ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following against GEICO General Insurance Company ("GEICO") and CCC Intelligent Solutions, Inc. ("CCC") (collectively as "Defendants"), based where applicable on personal knowledge, information and belief, and the investigation of counsel states as follows:

### I.    NATURE OF THE ACTION

1.    This action is brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*., the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), and state law for treble, actual and punitive damages.

2.    When a vehicle is totaled in an accident, the vehicle owner's insurance company must not underpay the claim by using manipulated data to arrive at the vehicle's value. New York law prohibits insurance companies from valuing a totaled vehicle by comparing it to vehicles of a different type, including vehicles with mileage exceeding the mileage of the totaled vehicle at the date of loss by more than 4,000 miles or ten percent, whichever is greater. *See, e.g.*, N.Y. Codes R. & Regs. Tit. 11 ("11 NYCRR") (Regulation 64), § 216.7.

3.      New York law also prohibits insurance companies from reducing a totaled vehicle's claim value with arbitrary, unspecified and unjustified adjustments to the condition of the comparable vehicles used to establish the totaled vehicle's value that bear no relation to actual cash value. *See* 11 NYCRR § 216. An insurer must not misstate or conceal material facts that are relevant to its estimation of a totaled vehicle's value. *Id*.

4.      Rather than follow New York law, Defendant GEICO conspires with Defendant CCC to undervalue claimants' total loss vehicles through the use of fraudulent and deceptive CCC valuation reports that purportedly establish the base value of insureds' total loss vehicles.

5.      CCC accomplishes its undervaluation of total loss vehicles, using its computerized database, by knowingly and intentionally selecting comparable vehicles to calculate the loss vehicle's value that are not substantially similar to the loss vehicle, as required by New York law. Specifically, CCC selects comparable vehicles for its valuation reports with mileage in excess of the greater of 4,000 miles or ten percent of the mileage on the totaled vehicle at the time of loss.

6.      CCC valuation reports also apply arbitrary reductions to the value of the comparable vehicles used in its reports, which it calls a "condition adjustment," without itemizing or explaining the basis for the negative adjustment. CCC's application of negative condition adjustments to comparable vehicles on valuation reports is part of a pattern and practice of CCC across its valuation reports of total loss vehicles, including that of Plaintiff and the members of the Class.

7.      CCC deceptively claims it "sets" each "comparable vehicle to Average Private condition," when, in fact, its valuation reports set each comparable vehicle to a condition that is better than so-called Average Private condition without explanation or documentation that the comparable vehicles were ever inspected.

8.     Evidencing the arbitrary nature of these condition adjustments, CCC applies them uniformly to all comparable vehicles included in a valuation report without distinguishing one vehicle from the next.

9.     GEICO, in turn, systematically uses these fraudulent and deceptive CCC reports as the basis for settlement offers to total loss claimants, deceptively presenting the valuations to be the actual cash value of the total loss vehicles.

10.     CCC's use of comparable vehicles that are not substantially similar to the loss vehicle and the application of arbitrary and unjustified condition adjustments to comparable vehicles in its valuation reports cause artificial and improper reductions to the total loss vehicle's base value, which results in significant reductions in claim payments to GEICO insureds and other claimants.

11.     CCC also includes outdated and/or incorrect information regarding the comparable vehicles used in its valuation reports, which further reduces the base value of the total loss vehicles of GEICO's claimants.

12.     GEICO contracts with CCC to value total loss claims despite the CCC database being inadequate to produce the statistically valid fair market values required by 11 NYCRR 216.7. CCC compounds the issues with its database by manipulating the data to generate reduced vehicle values for GEICO's total loss claimants.

13.     GEICO relies upon and uses CCC's fraudulent and deceptive valuation reports to underpay its total loss vehicle claims.

14.     GEICO's systematic undervaluation and underpayments of total loss claims, through its reliance on CCC's fraudulent and deceptive valuation reports, are contrary to the overarching requirements of New York insurance law requiring that "the insurer offer to

claimants" a settlement amount that is "fair and reasonable." 11 NYCRR § 216.6(a); *see also* N.Y. Ins. Law § 2601(a) (prohibiting insurers from "unfair claim settlement practices" including failure "in good faith to effectuate prompt, fair and equitable settlement of claims" and "failing to adopt and implement reasonable standards for the prompt  investigation of claims").

15.     GEICO's undervaluation and underpayments of total loss claims are also contrary to the principle of New York insurance law that claimants receive the "actual cash value" for their total loss vehicles (11 NYCRR § 216.6(b)), the requirement that valuations be based on comparables that are "statistically valid" and vehicles that are "substantially similar" to the loss vehicle (11 NYCRR § 216.7(c)(1)(iii)), and the requirement that any deductions for previous damage or the prior condition of vehicles be "measurable, discernible, itemized and specified." 11 NYCRR § 216.7(b)(12).

16.     GEICO, through the use of CCC's fraudulent and deceptive valuation reports, violates its insurance contracts and New York statutes and regulations governing the adjustment of total loss claims.

17.     GEICO and CCC, together, violate New York's prohibitions on consumer deception. N.Y. Gen. Bus. Law § 349.

18.     CCC uses the mail and/or wires to furnish its fraudulent and deceptive valuation reports to Defendant GEICO, which then bases its total loss settlement offers to claimants on the artificially reduced values derived from the fraudulent reports.

19.     GEICO uses the mail and/or wires to present claimants with the artificially reduced values from CCC's fraudulent reports as the legitimate actual cash value of claimants' total loss vehicles.

20.     GEICO and CCC, together, compose an association-in-fact enterprise ("the GEICO-CCC Enterprise") that has engaged in countless acts of racketeering in the course of their business relationship by use of the mail and/or wires to further their scheme to undervalue the settlements of GEICO's total loss vehicle claims.

21.     This scheme generates significant income to CCC as GEICO continues to utilize CCC to create fraudulent valuation reports that result in lower settlement payments, and GEICO saves significant money by paying lower amounts to settle total loss claims than it otherwise would if it used values that were not artificially reduced or improperly generated with manipulated data.

22.     Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq*. ("RICO"), with predicate acts of wire fraud and/or mail fraud.

23.     In addition, defendants' conduct gives rise to liability under numerous causes of action under New York law, including but not limited to breach of contract, unjust enrichment, and violations of the New York General Business Law § 349.

24.     As described herein, defendants systematically and continuously conducted a corrupt enterprise through a pattern of racketeering acts in violation of RICO, undertaken for their own benefit and for the wrongful purpose of harming and intentionally defrauding members of the public making total loss vehicle claims to GEICO, including GEICO's own insured customers.

25.     As alleged more fully below, Plaintiff's vehicle was declared a total loss after a collision. As part of Defendants' practices and procedures, CCC used false information and deceptively manipulated the data used in its valuation report to establish the value of Plaintiff's total loss vehicle and provided that report to GEICO which relied upon and used the fraudulent valuation to make an undervalued offer to settle Plaintiff's total loss claim.

26.     In doing so, Defendants failed to comply with minimum standards required by New York insurance law and regulations in valuing Plaintiff's total loss vehicle in order to underpay on his claim. Defendants' engaged in this same practice, which is ongoing, to underpay the total loss vehicle claims of thousands of New York consumers comprising the Class.

27.     Plaintiff brings this class action on behalf of all citizens of New York asserting total loss vehicle insurance claims pursuant to a GEICO private passenger vehicle policy from the earliest allowable time within the statute of limitations through and including the date of judgment (the "Class Period"), who received a first-party or third-party total loss settlement or settlement offer based in whole or in part on a CCC valuation report that included one or more comparable vehicles that either (i) was not substantially similar to the loss vehicle because it had a mileage in excess of the greater of 4,000 miles or ten percent of the mileage of the total loss vehicle; (ii) listed lower mileage information than the comparable vehicle actually had at the time of the valuation report; and/or (iii) had their price reduced by a "condition adjustment."

28.     Through this Complaint, Plaintiff and the Class seek to recover damages from Defendants to the fullest extent permitted under civil RICO laws. This civil RICO action seeks treble, actual, and punitive damages, together with interest, costs, and fees. Plaintiff and the Class also seek compensatory and statutory damages available at law under N.Y. Gen. Bus. Law § 349, damages for breach of contract, disgorgement and restitution of the amounts by which defendant was unjustly enriched by its wrongful conduct, attorneys' fees, and declaratory and injunctive relief, as well as all other just relief that this Court deems just and proper.

## II.    JURISDICTION

29.     This Court has subject matter jurisdiction over the RICO claims described herein under 28 U.S.C. § 1331 and under 18 U.S.C. § 1964(c) and (d).

30.     This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members, the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and members of the proposed Class are citizens of a state different from the Defendants' home states. Plaintiff is a citizen of New York, GEICO is a citizen of Maryland, and CCC is a citizen of Illinois (where it has its principal place of business) and Delaware (where it is incorporated).

31.     This Court also has supplemental jurisdiction over state law claims described herein under 28 U.S.C. § 1367.

32.     This Court has personal jurisdiction over GEICO as it conducts business and issues automobile insurance policies in the State of New York. This Court has jurisdiction over CCC as it transacts and conducts business in the State of New York by contracting to provide valuation services to insurance carriers in New York for use in settling and underpaying total loss claims of New York insureds. CCC derives substantial revenue from the State of New York and otherwise engages in interstate commerce.

### III.     VENUE

33.     Venue is proper in this District under 28 U.S.C. § 1391 because this is the District where a substantial part of the events giving rise to the claim occurred, Plaintiff resides in this District, the accident resulting in the totaling of Plaintiff's car occurred in this District, communications regarding Plaintiff's insurance claim were received in this District, and Plaintiff's causes of action arose in this District. Venue is also appropriate here because Defendants are subject to the Court's personal jurisdiction with respect to this action in this District.

## IV.    PARTIES

34.    Plaintiff Jonathan Chick is an individual who resides in Nassau County, New York. At all times relevant, Plaintiff was insured under a GEICO automobile insurance policy. Plaintiff filed a total loss claim for a private passenger vehicle under his GEICO policy. Plaintiff's policy is a form document and is substantially similar to the policies GEICO issued to Class Members.

35.    Defendant GEICO is a Maryland corporation with its principal place of business in Chevy Chase, Maryland. GEICO maintains regional corporate offices in New York and conducts business and issues automobile insurance policies in New York.

36.    Defendant CCC is a Delaware corporation with its principal place of business in Chicago, Illinois. At all relevant times, CCC transacted and conducted business in New York, derived substantial revenue from New York and otherwise engaged in interstate commerce, and continues to do so.

## V.    FACTUAL ALLEGATIONS

### A.    CCC has a history of allegations of fraudulent and deceptive practices

37.    Defendant CCC provides software services to hundreds of insurance companies. The company boasts having customer agreements with over 300 insurers, including 18 of the top 20 auto insurance carriers in the United States. Founded in 1980, CCC dominates the field of vehicle valuations, processing 3.5 million valuations annually for its insurance company customers.

38.    CCC states that it helps insurers digitize their claims processes. CCC touts the benefits of its digital software innovations for its insurance company customers, including "helping to deliver on the industry's vision of achieving Straight-Through-Processing (STP) – processing claims digitally with limited to no human intervention." CCC also promotes its proprietary data

assets, stating "[d]atabase solutions and corresponding rules engines can be configured and adjusted in real-time based on business needs and market trends."[1]

39.     CCC's total loss services deliver vehicle valuations to insurance companies that it claims represent "a vehicle's fair market value based on CCC's market-driven valuation methodology." In its 2022 Annual Report, CCC states that its "insurance solutions represent approximately 50% of our 2022 total revenues with 94% of that representing software revenue."

40.     CCC also states that a "substantial portion of our revenue is derived from a relatively small number of customers in the P&C [Property & Casualty] insurance and automotive collision industries" and that the company expects it "will continue to depend upon a relatively small number of customers for a significant portion of our revenue for the foreseeable future." CCC Annual Report at 16. CCC's operations and financial condition would be adversely impacted if it fails to successfully renew existing contracts with its insurance company customers or if any of the customers reduce or cancel services. *Id.*

41.      CCC is highly incentivized to deliver valuation reports that are favorable to its insurance company customers, including its auto collision insurance customers such as GEICO. As CCC has stated, it has the ability to adjust the "rules engines" of its database to accommodate business needs, including, presumably, the needs of its insurer customers to reduce the amount of their total loss settlement payments to claimants.

42.     CCC has a history of producing allegedly deceptive valuation reports, as evidenced by the considerable litigation involving both CCC directly and its auto insurance company

---

[1]     CCC Annual Report (2022). https://ir.cccis.com/static-files/5195ce99-3cef-4416-bca1-f8082099e6fc

customers that have used its valuation reports to establish settlement offers to their insureds and other claimants.

43.     By way of example, below is a list of class action lawsuits initiated against CCC and/or one of its insurance company customers that were premised on similar allegations as those alleged herein concerning CCC's deceptive valuation reports:

(i)     Daly v. Safeco Insurance Company, et al., Case No. 2:07-cv-00384 (E.D. Wa.)

(ii)    Byrne v. CCC Information Services, Inc., Case No. 3:10-cv-00337 (S.D. Ill.)

(iii)   Maggard v. CCC Information Services, Inc., Case No. 1:14-cv-02368 (N.D. Ill.)

(iv)    Cooper v. CCC Information Services, Inc., Case No. 2:15-cv-06500 (S.D. W.Va.)

(v)     Sisavath v. CCC Information Services, Inc., Case No. 9:15-cv-81727 (S.D. Fla.)

(vi)    Milligan v. GEICO General Insurance Company and CCC Information Services, Inc., Case No. 2:16-cv-00240 (E.D.N.Y.)

(vii)   Wallace v. Equity Insurance Company and CCC Information Services, Inc., Case No. 6:16-cv-00130 (E.D. Okla.)

(viii)  Lewis v. Government Employees Insurance Company, Case No. 1:18-cv-05111 (D. N.J.)

(ix)    Olberg v. Allstate Insurance Company, Case No. 2:18-cv-00573 (W.D. Wa.)

(x)     Kronenberg v. Allstate Insurance Company, et al., Case No. 1:18-cv-06899 (E.D. N.Y.)

(xi)    Lundquist v. First National Insurance Company of America, Case No. 3:18-cv-05301 (W.D. Wa.)

(xii)   Walker v. Allstate Property & Casualty Insurance Company and CCC Information Services, Inc., Case No. 2:19-cv-00701 (N.D. Ala.)

(xiii)  Fortson v. Garrison Property and Casualty Insurance Company, Case No. 1:19-cv-00294 (M.D. N.C.)

(xiv)   Murphy v. State Automobile Mutual Insurance Company, et al., Case No. 4:19-cv-00694 (E.D. Ark.)

(xv)    Williams v. GEICO General Insurance Company and CCC Information Services, Inc., Case No. 2:19-cv-01403

(xvi)    Philips v. Garrison Property & Casualty and CCC Information Services, Inc., Case No. 2:19-cv-01727 (N.D. Ala.)

(xvii)    Ruby v. United Services Automobile Association and CCC Information Services, Inc., Case No. 8:19-cv-02922 (M.D. Fla.)

(xviii)    See v. Government Employees Insurance Company, et al., Case No. 2:21-cv-00547 (E.D. N.Y.)

(xix)    Donlan v. United Services Automobile Association, et al., Case No. 2:21-cv-00989 (W.D. Wa.)

(xx)    Jackson v. USAA General Indemnity Company, Case No. 1:22-cv-01838 (D. Md.)

44.    Upon information and belief, the above is not an exhaustive list of litigation involving allegations of deceptive CCC valuation reports.

45.    Such lawsuits are not a recent development for CCC. As far back as 2001, CCC was a defendant in an action brought in Illinois State Court, in Madison County, Illinois.[2] The action alleged a "Total Loss Conspiratorial Scheme" between an insurance company, CGU, and its affiliates, and CCC, where CCC's computer software was used to systematically undervalue the "actual cash value" of total loss vehicles. *See* Ex. A, Class Action Complaint, filed February 6, 2001, at ¶ 5. The lawsuit further alleged the insurance company and CCC "internally estimated the savings that CGU reaped by using CCC reports to determine its Total Loss claim payouts." *Id*.

46.    In 2005, this case reached a settlement wherein the parties stipulated to certification of a class of plaintiffs for settlement purposes only. *See* Ex. B, Stipulation of Class Action Settlement, filed July 14, 2005, at ¶ 1. Among the relief provided to the class was a court-appointed monitor, retained for a period of five years at the sole cost of CCC. *Id*. at ¶ 32(a). The Monitor was

---

[2]    Bordoni v. CGU Insurance Group, et al., Case No. 01-L-157. At the time, CCC operated under the name CCC Information Services, Inc.

tasked with (1) providing CCC, class counsel, the insurance carriers, and the court with an annual report regarding the status of court-approved validation studies, (2) ensuring CCC complied with the obligations under the settlement, and (3) ensuring CCC provides fair and accurate valuations to insurers and consumers. *Id*. at ¶ 32(c). In connection with the settlement, CCC was required to perform 11 different validation studies "to further validate the processes and methodology used in its valuation product and services." *Id*. at ¶ 33(a).

47.     Among the studies CCC was required to perform were: (1) a "Vehicle Condition Market Value Impact Study" to "validate the impact of a vehicle's condition on its market value," and (2) a "Vehicle Mileage Value Impact Validation Study" to "validate the market value impact mileage has on a vehicle as mileage varies from the norm for a particular make, model and year in a particular market." *Id*.

48.     The Monitor submitted annual reports through 2012 after their tenure was extended by the court to allow for completion of the studies required by the settlement, all of which were filed under seal.

49.     Despite agreeing to settlement terms that required validation studies and a court-appointed monitor to ensure CCC valuation reports were fair and accurate, CCC has continued to manipulate data and produce fraudulent and deceptive reports for total loss vehicle claims.

50.     As CCC continued to "innovate" its services, it has pushed to make more of its procedures automated to achieve the processing of claims digitally with limited to no human intervention. This aids in keeping CCC's valuation methodologies shrouded from scrutiny and more easily susceptible to manipulation of data to ensure favorable outcomes for its insurance company customers.

B.     **Geico relies on CCC's manipulated data to underpay total loss claims**

51.     Geico is the second-largest private passenger auto insurer in the United States by market share, boasting over 17 million policies covering more than 28 million insured vehicles in all 50 states, including New York. GEICO touts its financial strength, noting on its website that the company is a wholly owned subsidiary of Berkwhire Hathaway, Inc., with assets of more than $32 billion.

52.     GEICO claims, on its website, to be "built on ingenuity, perseverance, innovation, resilience and hard, honest work." However, when its insured customers and third-party claimants experience life-altering incidents resulting in their vehicles being declared a total loss, GEICO is anything but honest. Instead, GEICO knowingly uses fraudulent and deceptive valuation reports prepared and supplied by CCC to underpay total loss claims when claimants are at their most vulnerable, having lost their means of personal transportation and relying on GEICO to pay the actual cash value of their vehicles to which they are entitled.

53.     GEICO's standard form automobile policy provides for payment on total loss physical damages claims of "Actual Cash Value" ("ACV"), which is defined by the policy as "the replacement cost of the auto or property less depreciation or betterment." Ex. C, GEICO New York Family Automobile Insurance Policy.

54.     New York insurance law prohibits insurers doing business in the state "from engaging in unfair claims settlement practices and has promulgated regulations containing "claim practice rules which insurers must apply to the processing of all first- and third-party claims." 11 NYCRR 216.0(a). These regulations require an insurer to offer claimants amounts which are "fair and reasonable as shown by its investigation of the claim." 11 NYCRR § 216.6(a). GEICO's

promise to pay the actual cash value of a total loss vehicle is in accordance with this requirement of New York insurance law.

55.    Nevertheless, GEICO systematically fails to offer and pay the actual cash value for total loss vehicles by calculating the values of such vehicles using methods that violate New York regulations and insurance law. By using improper methods to arrive at valuations for total loss vehicle claims, GEICO's settlement offers are not "fair and reasonable."

56.    New York insurance law regarding "Adjustment of total losses" states that:

If the insurer elects to make a cash settlement, <u>its minimum offer</u>, subject to applicable deductions, <u>must be one of the following</u>:

(i)    The average of the retail values for a substantially similar vehicle as listed in two valuation manuals current at the date of loss and approved by this Department . . . . The insurer may deduct documented, reasonable dealer preparation charges, up to $100, from the average of the retail values. . . .

(ii)    A quotation for a substantially similar vehicle, obtained by the insurer from a qualified dealer located reasonably convenient to the insured. A reasonable location shall be within 25 miles of the place of principal garagement of the motor vehicle. . . .

(iii)   A <u>quotation obtained from a computerized database</u>, approved by the superintendent, that produces <u>statistically valid</u> fair market values for a <u>substantially similar vehicle</u>, within the local market area that meets all the following minimum criteria:

(a)    it shall produce values for at least 85 percent of all makes and models of private passenger automobiles, as defined in section 67.1(a) of this Title, for the last 15 model years, and shall take into account the values of all major options for such vehicles;

(b)    it shall rely upon values derived from licensed dealers, which have minimum sales of 100 motor vehicles per year in the local market area for all vehicles of seven model years or less of age, and be based upon the physical inventory of vehicles sold within 90 days prior to the loss and vehicles which are available; and

(c)    it shall monitor the average retail price of private passenger automobiles when there is insufficient data or inventory available from licensed dealers to ensure statistically valid local market area values.

11 NYCRR § 216.7(c)(1)(i-iii).

57.    A "substantially similar vehicle" is defined in 11 NYCRR § 216.7(a)(4) as "a vehicle of the same make, model, year and condition, including all major options of the insured vehicle. Mileage must not exceed that of the insured vehicle by more than 4,000 miles or 10 percent of the mileage on the vehicle at the date of loss, whichever is greater."

58.    "Local market area" is defined in 11 NYCRR § 216.8(a)(10) as meaning "a 100-mile radius . . . of the place of principal garagement of the insured's motor vehicle."

59.    These requirements are incorporated into every automobile policy providing coverage for total losses and are expressly applicable to third-party claims pursuant to 11 NYCRR § 216.10. Further, the regulations require every insurer to "distribute copies of this regulation to every person directly responsible for the supervision, handling and settlement of claims subject to this regulation, and every insurer shall satisfy itself that all such personnel are thoroughly conversant with, and are complying with, this regulation." 11 NYCRR § 216.0(e)(6).

60.    Rather than follow these regulations and New York insurance law, GEICO bases its settlement offers and payments on fraudulent and deceptive valuation reports it obtains from Defendant CCC. These CCC reports use manipulated and inaccurate data to generate values for total loss vehicles that are neither statistically reliable nor valid.

61.    CCC has received and continues to receive substantial payments from GEICO for providing valuation reports for total loss vehicles.

62.    CCC generates valuation reports using its computerized database software "CCC One." These CCC One reports include purported list price values for comparable used vehicles that were recently sold or are available for sale in the local area of the insured claimant.

63.    Based on the values of the comparable vehicles, a "Base Vehicle Value" is calculated for the total loss vehicle at issue in the report, using a "weighted average of the adjusted

values of the comparable vehicles based on" the "Source of the data (such as inspected versus advertised)," "Similarity (such as equipment, mileage, and year)," "Proximity to the loss vehicle's primary garage location," and "Recency of information." Ex. D, Plaintiff's CCC One Market Valuation Report at 3.

64.    CCC valuation reports are fraudulent and deceptive due to the selection of the comparable vehicles that are used to establish the "Base Vehicle Value" of the total loss vehicle and the information about those comparable vehicles presented in the report.

65.    New York requires that quotations for total loss settlement offers obtained from a computerized database be based on "statistically valid fair market values for a substantially similar vehicle." 11 NYCRR § 216.7(c)(1)(iii). However, CCC reports include comparable vehicles that are not "substantially similar" to the total loss vehicle because their mileage exceeds that of the total loss vehicle by the greater of 4,000 miles or ten percent.

66.    CCC's valuation reports do not disclose that it is comparing the loss vehicle to a vehicle that is not substantially similar as defined by New York insurance regulations, but instead misstates that the selected vehicles used to establish the value of the loss vehicle are comparable to the loss vehicle.

67.    Due to CCC's selection of comparable vehicles that are not substantially similar to the total loss vehicle for its valuation reports, CCC fails to generate statistically valid fair market values in establishing the total loss vehicle's Base Vehicle Value, and results in an undervaluation of the loss vehicle.

68.    The valuation reports generated by CCC at GEICO's request are inadequate and not "statistically valid" as required by New York insurance regulations, which both CCC and GEICO fail to disclose to insured claimants. Rather than produce statistically valid fair market

values, the reports manipulate data and comparable vehicles to GEICO's advantage, resulting in underpayment of total loss claims and materially misleading consumers, including Plaintiff and members of the Class.

69.    CCC valuation reports also include factual misrepresentations regarding the non-substantially similar comparable vehicles it selects to determine total loss vehicle values. CCC reports contain incorrect mileage information for the comparable vehicles it selects, which can be off by more than 100,000 miles. The discrepancy between the mileage listed in the CCC report and the comparable vehicle's actual mileage can have a significant impact on the adjustments for mileage differences that CCC makes to the comparable vehicle's value, which necessarily and negatively affect the valuation of claimants' total loss vehicles.

70.    CCC reports also include adjustments to the comparable vehicles' "List Price," defined in the report as "the sticker price of an inspected dealer vehicle and the advertised price for the advertised vehicle."

71.    These adjustments are for differences between the selected comparable vehicles and the total loss vehicle being evaluated in the report, to arrive at an "Adjusted Comparable Value" for each comparable that is then averaged to establish the loss vehicle's value. Adjustments are made for differences in vehicle "Options," "Mileage," and "Condition."

72.    Where a comparable vehicle purports to have a mileage greater than the subject total loss vehicle, CCC includes a positive monetary adjustment to account for the discrepancy, thereby increasing the value of the comparable vehicle and, ostensibly, bringing it closer to the value of the loss vehicle. Conversely, where a comparable vehicle purports to have a mileage that is lower than the subject loss vehicle, CCC includes a negative monetary adjustment, lowering the value of the comparable vehicle. Therefore, for every selected comparable vehicle, CCC includes

a monetary adjustment based on mileage, one way or another, that materially affects its valuation of the comparable vehicles and, ultimately, the loss vehicle.

73.     CCC valuation reports fraudulently list lower reported mileage information for some comparable vehicles, resulting in either lower positive monetary adjustments or higher negative monetary adjustments to the values of the comparable vehicles.

74.     By listing lower mileage information for comparable vehicles, CCC reduces the valuation of the total loss vehicle being analyzed in its report. This practice deceives GEICO claimants into believing the valuations of total loss vehicles contained in CCC reports are accurate and reflect a statistically valid fair market value for a substantially similar vehicle.

75.     Arbitrary and unjustified condition adjustments to comparable vehicles are another systematic practice CCC uses in its valuation reports to artificially depress the value of the total loss vehicles being evaluated. CCC applies negative monetary adjustments of hundreds or thousands of dollars to each of the comparable vehicles appearing in one of its valuation reports.

76.     In an attempt to explain these negative adjustments, CCC reports state: "The Condition Adjustment sets that comparable vehicle to Average Private condition, which the loss vehicle is also compared to in the Vehicle Condition section." However, CCC fails to itemize or specify any basis for the condition adjustments and offers no explanation of the actual condition of the comparable vehicles that would justify the negative adjustments to "set[] that comparable vehicle to Average Private condition." Indeed, the term "Average Private" condition is undefined and easily susceptible to improper manipulation.

77.     Upon information and belief, CCC inspects few, if any, comparable vehicles that are included in its valuation reports.

78.     There are no legitimate justifications or explanations for the uniform condition adjustments applied to comparable vehicles in CCC reports. Evidencing the arbitrary and unjustified nature of these condition adjustments, CCC reports reduce the value of multiple comparable vehicles contained therein by the same exact amount, without explanation, bearing no relation to the actual condition or fair market value of the comparable vehicles or the loss vehicle.

79.     By applying arbitrary and unexplained uniform condition adjustments to the comparable vehicles used in its valuation reports, CCC artificially reduces the valuation of GEICO's claimants' loss vehicles. This, in turn, results in lower claim settlement offers by GEICO, to its own benefit, at the expense of its insured customers or other members of the public making a claim under an insurance policy issued by GEICO.

80.     Despite the above stated improper, fraudulent and deceptive practices by CCC in generating valuation reports, GEICO offers claimants a settlement amount that is equivalent to the valuation amount found in the CCC reports, falsely representing that the amount offered is a legitimate actual cash value for the loss vehicles.

### C.     Plaintiff's total loss claim is undervalued by Defendants' fraudulent and deceptive practices

81.     Plaintiff Jonathan Chick was the owner of a 1998 Jeep Cherokee Classic that was totaled in a collision on or about August 10, 2023. An "Initial Report" prepared by GEICO and made electronically available to Plaintiff through GEICO's website notes that the incident occurred on August 10, 2023 and was reported to GEICO on that same date by Plaintiff. *See* Ex. E, GEICO Initial Report. GEICO assigned a claim number in connection with the collision of 0403103280101045. *Id.*

82.     On or about August 17, 2023, GEICO electronically sent Plaintiff an "Estimate of Record," which stated the net cost of repairs for the damage to Plaintiff's vehicle would total

$2,144.80. On or about August 22, 2023, GEICO electronically sent Plaintiff a supplemental estimate, projecting that additional labor and parts would be needed to repair the vehicle, increasing the net cost to repair to $4,394.10. At this point, GEICO declared the vehicle a total loss.

83. On or about August 22, 2023, GEICO sent Plaintiff's claim to CCC to prepare a Market Valuation Report for Plaintiff's vehicle. Using its valuation database software, CCC One, CCC determined the "Base Vehicle Value" of Plaintiff's vehicle was $3,837.00. The report then adjusted the vehicle value for taxes that would be due, as required by New York insurance regulations. A vehicular tax of 8.625% was applied, totaling $330.94, increasing the vehicle's value before applying Plaintiff's deductible to $4,167.94. After applying Plaintiff's $500.00 deductible, CCC's valuation for Plaintiff's vehicle came to $3,667.94.

84. CCC provided the valuation report to GEICO using the mail and/or wires.

85. On or about September 5, 2023, GEICO electronically sent Plaintiff a letter using the wires, enclosing a Total Loss Settlement Explanation that laid out the final valuation figures that CCC used in its report stating that Plaintiff's vehicle had a base value of $3,837.00, plus tax of $330.94, less Plaintiff's deductible of $500, to arrive at a net settlement amount of $3,667.94. *See* Ex. F, Total Loss Settlement Explanation. The letter noted that the "Market Valuation" for Plaintiff's vehicle was available on GEICO's website.

86. Based on the valuation report provided by CCC, GEICO determined the actual cash value of Plaintiff's total loss vehicle was $3,837.00 (before the addition of taxes and subtraction of Plaintiff's deductible) and paid the claim accordingly.

87.     The CCC valuation report upon which GEICO relied in basing its settlement offer to Plaintiff included values for four different comparable vehicles. At the time it was declared a total loss, Plaintiff's vehicle had 151,020 miles on the odometer.

88.     In order to comply with New York insurance regulations requiring that value quotations from a computerized database be produced using statistically valid fair market values for a substantially similar vehicle, any comparable vehicle used in the CCC report had to be within the greater of 4,000 miles or ten percent of the mileage of Plaintiff's vehicle.

89.     Ten percent of Plaintiff's vehicle mileage at the time it was declared a total loss was 15,102 miles, meaning a substantially similar comparable vehicle used in the CCC valuation report should have had mileage of no more than 166,122. The CCC valuation report of Plaintiff's vehicle included two vehicles that CCC listed as having mileage above 166,122.

90.     The comparable vehicle labeled as "Comp 1" listed an odometer value of 198,262 miles, which is more than 32,000 miles over the mileage that would comply with New York insurance regulations for a substantially similar vehicle.

91.     The comparable vehicle labeled as "Comp 4" listed an odometer value of 172,658, which is more than 6,500 miles over the mileage that would comply with New York insurance regulations for a substantially similar vehicle.

92.     The CCC report stated a list price for Comp 1 of $3,295 and included a positive mileage adjustment to its value of $983, amounting to $0.02 per mile above the mileage of Plaintiff's total loss vehicle.

93.     The CCC report stated a list price for Comp 4 of $3,800, however that vehicle was listed as an "Additional Comparable Vehicle" and had no itemization of the adjustments made to its value. The CCC report stated that "Additional Comparable Vehicles are in summary format,

but are adjusted the same as those on the previous page." Therefore, there was a similar positive mileage adjustment included in the Comp 4 vehicle's valuation, but the CCC report fails to provide an explanation for any adjustments and simply includes an "Adjusted Comparable Value" for this vehicle of $3,673. The report also fails to explain why one of four comparable vehicles was presented in summary format, as opposed to providing an itemized explanation of the adjustments CCC applied.

94.     In addition to using comparable vehicles that were not substantially similar to Plaintiff's car based on their mileage, CCC included false, misleading and incorrect information about the other two comparable vehicles that were used to value Plaintiff's total loss vehicle.

95.     The comparable vehicle from CCC's valuation report of Plaintiff's vehicle labeled as "Comp 2" is listed with an odometer reading of 125,033. The vehicle, a 1999 Jeep Cherokee Limited with vehicle identification number ("VIN") 1J4FF78S5XL666023, had a list price of $4,995. This vehicle's mileage, according to the CCC report, was 25,987 miles below Plaintiff's total loss vehicle, resulting in CCC applying a negative monetary adjustment of (-$319).

96.     If the vehicle listed as Comp 2 did, in fact, have 25,987 miles less than Plaintiff's total loss vehicle, it would be a substantially similar vehicle as defined by New York insurance regulations.

97.     However, research into the vehicle listed as Comp 2, based on its VIN, reveals that the last reported odometer reading, from January 21, 2020, was actually 232,061. In fact, the last time this vehicle had a reported odometer reading of 125,033 was on September 2, 2011, twelve years before CCC included Comp 2 on Plaintiff's valuation report.

98.     The CCC report fraudulently misrepresented the mileage of the Comp 2 vehicle to be 107,028 miles below its actual last reported odometer reading. Rather than having 25,987 miles

less than Plaintiff's total loss vehicle, the vehicle listed as Comp 2 instead had 81,041 miles <u>more</u> than Plaintiff's vehicle.

99.     If CCC had applied the same positive mileage adjustment of $0.02 per mile above the mileage on Plaintiff's vehicle to Comp 2 that it applied to Comp 1, than the Comp 2 vehicle would have had a positive monetary adjustment of approximately $1,620. Instead, CCC's fraudulent report included a negative monetary adjustment of (-$319). CCC's fraudulent misrepresentations concerning the mileage on the vehicle listed as Comp 2, therefore, resulted in undervaluing Comp 2 by approximately $1,939. By lowering the value of Comp 2 in Plaintiff's valuation report with fraudulent and incorrect information, CCC undervalued Plaintiff's total loss vehicle.

100.     The comparable vehicle from CCC's valuation report of Plaintiff's vehicle labeled as "Comp 3" is listed with an odometer reading of 69,314. The vehicle, a 1999 Jeep Cherokee Sport with the VIN 1J4FF68S7XL564121, had a list price of $5,995. This vehicle's mileage, according to the CCC report, was 81,706 miles below Plaintiff's total loss vehicle, resulting in CCC applying a negative monetary adjustment of (-$1,189).

101.     However, research into Comp 3, based on its VIN, reveals that the last confirmed reported odometer reading, from October 13, 2019, was 137,595. A VIN report for this vehicle states that there is a mileage inconsistency on the vehicle, as the last reported mileage from October 13, 2023, was 17,140, which the VIN report states may be a clerical error. However, the CCC valuation report for Plaintiff's vehicle was prepared in approximately late August 2023. The information available on this vehicle's mileage at the time CCC prepared Plaintiff's valuation report was an odometer reading of 137,595.

102.    The CCC report fraudulently misrepresented the mileage of the Comp 3 vehicle to be 68,281 miles below its actual last reported odometer reading prior to CCC's report. Rather than having 81,706 miles less than Plaintiff's total loss vehicle, the vehicle listed as Comp 3 instead had only 13,425 miles less than Plaintiff's vehicle.

103.    If CCC had applied the same mileage adjustment of $0.02 per mile above the mileage on Plaintiff's vehicle to Comp 3 that it applied to Comp 1, the Comp 3 vehicle would have had a negative monetary adjustment of approximately (-$268). Instead, CCC's fraudulent report included a negative monetary adjustment of (-$1,189). CCC's fraudulent misrepresentations concerning the mileage on the vehicle listed as Comp 3, therefore, resulted in undervaluing Comp 3 by approximately $921. By lowering the value of Comp 3 in Plaintiff's valuation report with fraudulent and incorrect information, CCC undervalued Plaintiff's total loss vehicle.

104.    The CCC valuation report for Plaintiff's total loss vehicle also applied a uniform "condition adjustment" of (-$635) to each of the comparable vehicles it selected.[3] This uniformly applied negative condition adjustment was applied without itemizing or explaining the basis of the adjustment. These condition adjustments are not based on inspection of the vehicles, are not detailed, measurable, discernible, or itemized as to dollar amount, and are not justified by the actual condition of the comparable vehicles.

105.    The CCC valuation report used the "condition adjustment" to reduce the values of the comparable vehicles by exactly the same amount, regardless of any individual differences in

---

[3]    As stated above, the vehicle listed as "Comp 4" on Plaintiff's CCC valuation report was an "Additional Comparable Vehicle" which was provided "in summary format" but was "adjusted the same as" the other comparable vehicles presented with an itemized checklist of options and a breakdown of the adjustments for "Options," "Mileage," and "Condition." As the report states Comp 4 was adjusted the same as the other comparable vehicles, a negative condition adjustment of -$635 was applied to this vehicle.

the actual condition of the vehicles. These blanket adjustments were arbitrary and unjustified, reducing the values of the "comparable vehicles" used to establish the value of Plaintiff's total loss vehicle and resulting in an underpayment of Plaintiff's claim by $635.

106.    This negative condition adjustment was not disclosed on the first page of the CCC valuation report, which instead lists the same amount of $3,837 for the Base Vehicle Value and the Adjusted Vehicle Value of Plaintiff's car. *See* Ex. D at 1. The negative condition adjustment was also not disclosed in the Total Loss Settlement Explanation that was electronically sent to Plaintiff by GEICO. *See* Ex. F at 2.

107.    GEICO and CCC both fail to provide any explanation for the negative condition adjustment applied to the comparable vehicles in Plaintiff's valuation report. The report provides no description or itemization of the comparable vehicles actual condition, unlike the itemized evaluation of Plaintiff's loss vehicle contained in the report. There is no indication in the report that the condition of the comparable vehicles were ever examined to apply the negative condition adjustment.

108.    Despite the report stating the comparable vehicles were set to "Average Private condition," the negative condition adjustment shows that each comparable vehicle in the report was assumed to be in a condition that was $635 better than "Average Private condition." There was no justification for the assumption, without inspection or documentation of the condition of the comparable vehicles, that they were, uniformly, in a condition that is $635 better than "Average Private condition."

109.    By applying an unjustified and deceptive negative condition adjustment to the comparable vehicles in Plaintiff's valuation report, CCC artificially reduced and misrepresented the value of Plaintiff's total loss vehicle.

110.    By using the CCC valuation report containing the unjustified and deceptive negative condition adjustment to determine Plaintiff's claim settlement amount, GEICO misrepresented the actual cash value of Plaintiff's total loss vehicle and denied Plaintiff the services for which he contracted.

111.    GEICO, as a routine business practice, misrepresents to claimants, including Plaintiff, that the valuations from the deceptive CCC valuation reports equate with the actual cash value of their total loss vehicles.

112.    In sum, the CCC valuation report of Plaintiff's total loss vehicle was fraudulent and deceptive in that: (i) three of the four "comparable vehicles" selected by CCC to establish the settlement value of Plaintiff's vehicle were not substantially similar to his vehicle, as their mileage exceeded the mileage on the loss vehicle by amounts greater than is allowed under New York insurance regulations; (ii) two of the four "comparable vehicles" selected for the report by CCC were listed with inaccurate mileage information (by 107,028 miles for Comp 2 and 68,281 miles for Comp 3) that was dramatically lower than their actual mileage; and (iii) the report uniformly applied an unjustified and unexplained "condition adjustment" to each of the comparable vehicles amounting to (-$635).

113.    Each of these deceptive practices reduced the valuation of Plaintiff's total loss vehicle, resulting in a lower total loss claim settlement than Plaintiff was entitled to receive and a denial of the services for which he contracted with GEICO.

114.    Defendants GEICO and CCC knew that the "comparable vehicles" selected for the CCC valuation report to value Plaintiff's total loss vehicle were not substantially similar to Plaintiff's vehicle, as defined and required by New York insurance regulations.

115. CCC also knew that it included incorrect, outdated and deceptive information about the "comparable vehicles" it selected to use in its valuation report to value Plaintiff's total loss vehicle.

116. Upon information and belief, GEICO also knew that CCC included incorrect, outdated and deceptive information about the "comparable vehicles" CCC selected for its valuation report of Plaintiff's vehicle.

117. Defendants GEICO and CCC knew that the CCC valuation report uniformly applied an unjustified and unexplained "condition adjustment" to each of the comparable vehicles selected for the report, resulting in lower values for the comparable vehicles that, in turn, artificially reduced the value of Plaintiff's total loss vehicle.

118. The above described fraudulent and deceptive practices that undervalued Plaintiff's total loss claim were also used to undervalue the claims of members of the Class in the same manner. At all times relevant, CCC valuation reports followed the same procedures, disclosing the same or substantially the same information and presented that information in the same or substantially same format as Plaintiff's CCC valuation report.

119. These practices are applied to CCC reports prepared for GEICO as part of an ongoing association-in-fact enterprise between CCC and GEICO that has injured thousands of members of the public that made total loss claims with GEICO, including GEICO's insured customers and Plaintiff.

120. CCC transmitted, and continues to transmit, its fraudulent and deceptive valuation reports for Class Members' total loss vehicles to GEICO by mail and/or the wires.

121.    GEICO sent Class Members a communication by mail and/or the wires, representing that the actual cash value of their total loss vehicles were the same amounts determined by CCC's fraudulent and deceptive valuation reports.

122.    GEICO also sent Class Members a copy of the CCC valuation report for their respective vehicles by mail and/or the wires, and/or made the reports available to Class Members online.

123.    Defendants GEICO and CCC manipulated data and vehicle values to reduce settlements of total loss claims as set forth above. GEICO and CCC use valuation methods that are unfair, misleading, non-compliant with New York insurance law and regulations, and calculated to confuse and deceive consumers in the process of settling total loss claims with GEICO.

124.    The practices of GEICO and CCC have cost, and continue to cost, claimants millions of dollars in losses through the underpayment of total loss claims. At the same time, GEICO and CCC have made wrongful profits from their improper and deceptive conduct. GEICO pays out less in total loss settlement claims and CCC is paid by GEICO to generate more and more fraudulent and deceptive valuation reports.

## VI.    CLASS ACTION ALLEGATIONS

125.    The Representative Plaintiff brings this action individually and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All citizens of New York asserting insurance claims pursuant to a GEICO private passenger vehicle policy who, from the earliest allowable time within the statute of limitations through and including the date of judgment, received a first-party or third-party total loss settlement or settlement offer based, in whole or in part, on a CCC valuation report to establish the value of the total loss which included one or more comparable vehicles that either (i) had mileage that exceeded the mileage of the loss vehicle by more than the greater of 4,000 miles or ten percent; (ii) listed lower mileage information than the comparable vehicle actually had at the time of the valuation report; or (iii) had their price reduced by a "condition adjustment."

126.    Excluded from the Class are GEICO, CCC and their officers, directors, agents, employees, counsel and subsidiaries and affiliates; Class Counsel, employees of Class Counsel's firm and associated law firm, and Class Counsel's immediate family members; the presiding Judge and Magistrate Judge and their immediate family members; and all persons who make a timely election to be excluded from the Class.

127.    Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the class definition.

128.    The members of the Class are so numerous that joinder of all members is impracticable. Although the precise number of Class members are known only to Defendants, Plaintiff avers, upon information and belief, that Defendants have used fraudulent and deceptive CCC valuation reports to generate artificially reduced total loss settlement values for thousands of New York claimants. The exact number of Class Members can be readily determined by documents produced by Defendants.

129.    There are questions of fact and law common to the Class that predominate over any questions affecting only individual Class members, including the following:

- Whether Defendants calculated the value of total loss vehicles using comparable vehicles in CCC valuation reports that were not substantially similar, as defined and required by New York insurance regulations;

- Whether Defendants calculated the value of total loss vehicles using incorrect information about comparable vehicles in CCC valuation reports;

- Whether Defendants calculated the value of total loss vehicles by applying arbitrary, unitemized, and unsupported condition adjustments to comparable vehicles in CCC valuation reports;

- Whether, through the foregoing practices, Defendants formed an association-in-fact enterprise as defined by 18 U.S.C. § 1961;

- Whether, through the foregoing practices, Defendants engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961;

- Whether, through the foregoing practices, Defendants violated RICO, 18 U.S.C. § 1962(c);

- Whether, through the foregoing practices, Defendants conspired to violate RICO, 18 U.S.C. § 1962(d);

- Whether, through the foregoing practices, GEICO breached its insurance contracts with its insureds;

- Whether, through the foregoing practices, GEICO violated New York Insurance Law, § 2601 *et seq.* (Unfair claim settlement practices);

- Whether, through the foregoing practices, GEICO violated New York insurance regulations governing unfair claims settlement practices including 11 NYCRR §§ 216;

- Whether, through the foregoing practices, Defendants violated New York General Business Law § 349;

- Whether Defendants' use of CCC valuation reports to establish the value of total loss vehicles that included comparable vehicles that were not substantially similar to the loss vehicle caused injury to Plaintiffs and the Class;

- Whether Defendants' use of CCC valuation reports to establish the value of total loss vehicles that included incorrect information about the mileage of comparable vehicles caused injury to Plaintiffs and the Class;

- Whether Defendants' use of CCC valuation reports to establish the value of total loss vehicles that included improper condition adjustments to the comparable vehicles caused injury to Plaintiffs and the Class;

- Whether Defendants' actions were willful, knowing, reckless or malicious;

- Whether Defendants' actions as set forth herein damaged Plaintiff and the Class and, if so, the measure of such damages;

- Whether Plaintiff and the Class are entitled to an award of compensatory or other damages by law or statute;

- Whether Plaintiff and the Class are entitled to treble damages and cost of suit, including a reasonable attorney's fee, under 18 U.S.C. § 1694(c);

- Whether Plaintiff and the Class are entitled to actual, minimum and/or treble damages, as proven, under New York GBL § 349;

- Whether Plaintiff and the Class are entitled to an award of attorney's fees;

- Whether Plaintiff and the Class are entitled to declaratory and injunctive relief.

130.    Plaintiff has the same interests in this matter as all other members of the Class. Plaintiff's claims are typical of the claims of the Class, which arise from the same operative facts and are based on the same legal theories.

131.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to vigorously litigating this matter and has retained counsel who have litigated numerous class action lawsuits including cases involving unlawful business practices claims. Neither Plaintiff nor his counsel have any interests which might keep them from vigorously pursuing the claims or protecting the interests of all Class Members.

132.    This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

133.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

134.    A class action is a superior method for the fair and efficient adjudication of this controversy.  The interest of Class Members in individually controlling the prosecution of separate claims against Defendants is slight because of the sheer number of claims against the Defendants and the complexity of the matter.

135.    Management of the Class's claims is likely to present significantly fewer difficulties than those presented by massive numbers of individual claims. The identities of the Class Members may be obtained from Defendants' records.

136.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants' actions are generally applicable to the Class as a whole making the final injunctive relief and/or corresponding declaratory relief that Plaintiff seeks here appropriate with respect to the Class as a whole.

137.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law and fact enumerated herein predominate over questions affecting only individual members of the Class and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual Class Members will prosecute separate actions is remote due to the limited damages per Class Member and the time and expense necessary to conduct such litigation. Plaintiff's counsel, highly experienced in class action litigation, foresees little difficulty in the management of this case as a class action.

### VII.    COUNTS ALLEGED

**FIRST CAUSE OF ACTION**
**(Violations of RICO, 18 U.S.C. § 1962(c))**
**(Against GEICO and CCC)**

138.    Plaintiff incorporates the paragraphs above as if fully set forth herein.

139.    At all relevant times, Plaintiff was a "person" with the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

140.    At all relevant times, GEICO was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

141.    At all relevant times, CCC was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

142.    At all relevant times, the GEICO-CCC Enterprise: (i) was an ongoing association-in-fact enterprise with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit.

143.    At all relevant times, the GEICO-CCC Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

### The GEICO-CCC Enterprise

144.    The Defendants are entities associated together in fact as the GEICO-CCC Enterprise for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Complaint. Namely, through years of individual acts of fraud and deception, these Defendants caused Plaintiff and the Class to receive underpayments for their total loss claims based on the fraudulent and deceptive practices related to CCC valuation reports and GEICO's use and relieance thereon.

145.    The GEICO-CCC Enterprise functions as a continuing unit and exhibits an informal command structure with the purpose of valuing total loss vehicles and settling claims associated with the losses, which constitute business activities affecting interstate commerce. At all times relevant to this Complaint, the Defendants engaged in the operation or management of the GEICO-CCC Enterprise.

146.    The predicate acts described herein constitute a pattern of racketeering activity and are part of a common scheme to enrich the GEICO-CCC Enterprise at the expense of Plaintiff and the Class through acts constituting mail fraud, in violation of 18 U.S.C. § 1341, and/or wire fraud, in violation of 18 U.S.C. § 1343.

### *Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343)*

147.    By the acts described herein, the members of the GEICO-CCC Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded, and that was intended to defraud, Plaintiff and the Class, and that employed the use of the mails in furtherance thereof.

148.    In furtherance of that scheme, and as described herein, the Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate and/or foreign commerce, writings, signs, signals, pictures, and/or sounds, and/or caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to the following:

- fradulent and deceptive CCC valuation reports containing false and misleading statements including: (i) the value of total loss vehicles; (ii) the value of comparable vehicles upon which the total loss vehicle values were based; and (iii) material information about the comparable vehicles; and

- correspondence incorporating false and misleading statements from CCC valuation reports including settlement offers and/or payments from GEICO to claimants amounting to the total loss vehicle values from the CCC valuation reports.

149.    The CCC valuation report of Plaintiff's and Class Members' total loss vehicles were sent by the mail and/or the wires from CCC to GEICO, containing the false and misleading statements as set forth more fully above, in furtherance of Defendants' fraudulent scheme and for the purpose of executing such scheme.

150.    The CCC valuation reports were also provided or made available by GEICO to Plaintiff's and Class Members by the mail and/or the wires in furtherance of Defendants' fraudulent scheme and for the purpose of executing such scheme.

151.    At all relevant times, Defendants were employed by or associated with the GEICO-CCC Enterprise and conducted and participated in the conduct of the GEICO-CCC Enterprise through the pattern of racketeering activity described above.

152.    As a direct and proximate result of the violations set forth above, Plaintiff and the Class have been injured. Defendants' violations of § 1962(c) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

### SECOND CAUSE OF ACTION
### (Violations of RICO, 18 U.S.C. § 1962(d))
### (Against GEICO and CCC)

153.    Plaintiff incorporates the paragraphs above as if fully set forth herein.

154.    At all relevant times, Plaintiff was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

155.    At all relevant times, GEICO was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

156.    At all relevant times, CCC was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

157.    At all relevant times, the GEICO-CCC Enterprise: (i) was an ongoing association-in-fact enterprise with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that functioned as a continuing unit.

158.    The Defendants entered into agreements between and among each other to engage in a conspiracy to violate 18 U.S.C. § 1962(c). Each defendant entered into at least one agreement with at least one other defendant to join the conspiracy, took acts in furtherance of the conspiracy, and knowingly participated in the conspiracy.

159.    The defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the GEICO-CCC Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

160.    By engaging in those acts of racketeering as set forth above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

161.    Each defendant is a member of the GEICO-CCC Enterprise and as co-conspirators, Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff and the Class that were caused by any members of the conspiracy, regardless of whether the defendant was directly involved in a particular aspect of the GEICO-CCC Enterprise.

162.    As a direct and proximate result of the violations set forth above, Plaintiff and the Class have been injured. Defendants' violations of § 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**
**(Against GEICO)**

163.    Plaintiff incorporates the paragraphs above as if fully set forth herein.

164.    GEICO's New York automobile insurance contract specifically provides for the payment of the "actual cash value" of a vehicle deemed a total loss because of collisions or comprehensive losses.

165.    Upon information and belief, the material provisions of GEICO's New York automobile insurance contract are identical for Plaintiff and all Class Members.

166.    GEICO has breached the contract by not offering to settle and by failing to settle total loss vehicle claims based upon the actual cash value of loss vehicles. GEICO departed from actual cash values by: (1) basing its valuation and payment of the claims on values of comparable vehicles in CCC valuation reports that were not substantially similar to the loss vehicles because the comparable vehicles had mileage in excess of the greater of 4,000 miles or ten percent of the loss vehicle; (2) basing its valuation and payment of the claims on values of comparable vehicles in CCC valuation reports based on false and misleading information about the comparable vehicles including, but not limited to the mileage of the comparable vehicles; and (3) basing its valuation and payment of the claims on values of comparable vehicles in CCC valuation reports that were artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained.

167.    GEICO's numerous breaches have resulted in a systematic failure to pay the actual cash value of total loss vehicles as required by contract.

168.    GEICO's breaches and violations have caused damage to Plaintiff and the first-party insured members of the Class.

**FOURTH CAUSE OF ACTION**
**(Violations of New York General Business Law § 349)**
**(Against GEICO and CCC)**

169.    Plaintiff incorporates the paragraphs above as if fully set forth herein.

170.    New York General Business Law § 349(a) states, "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

171.    Defendants' actions set forth above are deceptive acts and practices in the conduct of Defendants' businesses that have the capacity to and do, in fact, deceive and injure consumers. CCC manipulates data and prepares and provides to GEICO fraudulent and deceptive valuation reports that undervalue consumers' total loss vehicles, which GEICO uses as the basis for total loss settlement offers and payments. Defendants knowingly misrepresented and concealed the bases for their total loss valuations and manipulated the bases for their total loss valuations to deceive consumers and underpay on claims to benefit themselves.

172.    CCC willfully, knowingly and/or negligently failed to use practices to value total loss claims that produce fair and reasonable valuations and failed to comply with statutory requirements to produce statistically valid results.

173.    GEICO willfully, knowingly and/or negligently failed to use practices to value total loss claims that produce fair and reasonable valuations, failed to comply with statutory requirements to produce statistically valid results, failed to adopt and implement reasonable standards for the investigation of claims, and failed to conduct a reasonable investigation regarding its claims payments.

174.    GEICO further made false representations as to the characteristics and benefits of its total loss coverage and insurance policies and represented that they were of a particular standard, quality, or grade, knowing that they were not.

175.    It is a deceptive business practice for Defendants to: (1) base its valuations and payments of total loss claims on values of comparable vehicles in CCC valuation reports that were

not substantially similar to the loss vehicles because the comparable vehicles had mileage in excess of the greater of 4,000 miles or ten percent of the loss vehicle; (2) base its valuations and payments of total loss claims on values of comparable vehicles in CCC valuation reports based on false and misleading information about the comparable vehicles including, but not limited to the mileage of the comparable vehicles; and (3) base its valuations and payments of total loss claims on values of comparable vehicles in CCC valuation reports that were artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained. All of these practices have the effect of reducing the value of consumers' total loss vehicles.

176. Defendants' conduct, set forth above, continues to occur in the course of Defendants' businesses and is part of a generalized course of conduct repeated on thousands of occasions, thus impacting the public interest.

177. CCC's conduct, set forth above, using manipulated and false data to generate total loss vehicle reports that result in significantly reduced vehicle valuations is inherently deceptive and is in violation of NY GBL § 349. Moreover, CCC's conduct is willful and knowing.

178. GEICO's conduct, set forth above, is in violation of N.Y. Insurance Law § 2601(a), and 11 NYCRR §§ 216.0 and 216.7, which establishes minimum standards for insurers settling claims. GEICO's conduct is inherently deceptive and is in violation of NY GBL § 349. Moreover, GEICO's conduct is willful and knowing.

179. As a result of Defendants' actions, Plaintiff and the Class incurred damages as more fully set forth herein.

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against GEICO)**

180. Plaintiff incorporates the paragraphs above as if fully set forth herein.

181.    As a result of its actions, set forth above, GEICO has been unjustly enriched at the expense of Plaintiff and the Class.

182.    GEICO knew that Plaintiff and members of the Class would assert claims under their GEICO policies in the event their vehicles were declared total losses covered by policies issued by GEICO. As set forth above, Plaintiff and members of the Class were entitled to compensation for their total loss vehicles in amounts higher than offered or paid by GEICO.

183.    GEICO knowingly benefited from its improper conduct, as set forth above, by retaining the amounts for itself that should have been paid to Plaintiff and members of the Class.

184.    Under the circumstances set forth above, it is contrary to equity and good conscience to permit GEICO to retain the monies that should have been paid to Plaintiff and members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests a jury trial and prays for relief and judgment as follows:

A.    an Order certifying this action as a class action on behalf of the Class described above;

B.    an Order appointing Plaintiff as class representative and appointing the undersigned counsel to represent the Class;

C.    on the First Cause of Action for violations of RICO, 18 U.S.C. § 1962(c), damages, including interest, against Defendants, jointly and severally, in the amount of threefold the actual damages this Court finds Plaintiff and the Class has sustained and the cost of this action, including reasonable attorneys' fees, as described by 18

U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs and other relief as the Court deems just and equitable;

D.      on the Second Cause of Action for violations of RICO, 18 U.S.C. § 1962(d), damages, including interest, against Defendants, jointly and severally, in the amount of threefold the actual damages this Court finds Plaintiff and the Class has sustained and the cost of this action, including reasonable attorneys' fees, as described by 18 U.S.C. § 1964(c), and such additional compensatory damages, punitive damages, costs and other relief as the Court deems just and equitable;

E.      on the Third Cause of Action for breach of contract, compensatory and/or other damages, as warranted by GEICO's conduct described above, including, without limitation, contract damages for first-party insureds, in an amount to be determined at trial;

F.      on the Fourth Cause of Action for violations of NY GBL § 349, damages against Defendants in the amount of threefold the actual damages Plaintiff and the Class has sustained in an amount to be determined at trial, and reasonable attorneys' fees as described by NY GBL § 349;

G.      on the Fifth Cause of Action for unjust enrichment, disgorgement by GEICO of all monies by which it has been unjustly enriched at the expense of Plaintiff and the Class, and an imposition of a constructive trust on such monies for the benefit of Plaintiff and the Class;

H.      on all causes of action, awarding Plaintiff all applicable interest, costs and disbursements incurred in connection with this action;

I.      an Order granting declaratory relief pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 declaring the rights of GEICO policyholders and those who would be insured under such policies and who may suffer similar losses in the future, as well as those who have suffered losses based on the valuation of their total loss vehicles, and declaring the liabilities of Defendants;

J.      an Order granting injunctive relief, including an injunction requiring Defendants to cease and desist from basing total loss vehicle valuations and settlement offers and/or payments of claims on valuations of comparable vehicles that (1) had mileage that exceeded the mileage of the loss vehicle by more than the greater of 4,000 miles or ten percent; (2) listed lower mileage information than the comparable vehicle actually had at the time of the valuation report; and/or (3) had their price reduced by a "condition adjustment," because Plaintiff and the Class has no plain, speedy, or adequate remedy at law, the respective interests of the parties favor an injunction, and an injunction is in the public interest;

K.      an award of attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed upon the Class; and

L.      such other relief as this Court may deem just, equitable or proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this complaint so triable.


DATED:      February 13, 2024

LEWIS SAUL & ASSOCIATES, P.C.

By:      /s/ *Edward A. Coleman*
Lewis J. Saul
Edward A. Coleman
29 Howard Street, 3rd Floor
New York, NY 10013
(212) 376-8450

*Counsel for Plaintiff and the Class*